AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

**FILED**

DEC – 6 2016

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| 1) Apple iPhone, 2) Samsung Galaxy Cellular Phone 3) HP Laptop, 4) Canon Power Shot Camera | ) |

Case No.

**'16 MJ 3733**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ Southern _____ District of _____ California _____ *(identify the person or describe property to be searched and give its location):* **See Attachments A1-A4**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* **See Attachments A1-A4, B and the affidavit of ICE OPR Special Agent Tom Miller, which is incorporated herein.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___ 18 ___ U.S.C. § __ See Affidavit __ , and the application is based on these facts: **The Affidavit of ICE OPR Special Agent Tom Miller, is incorporated herein by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Thomas Miller, Special Agent, ICE OPR**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _12/6/16_

_____
*Judge's signature*

City and state: San Diego, California

**Honorable Karen S. Crawford, U.S. Magistrate Judge**
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Thomas Miller, Special Agent with Immigration and Customs Enforcement, Office of Professional Responsibility, being duly sworn, hereby depose and state the following:

### I

### INTRODUCTION

1.    I make this affidavit in support of an application for a search warrant for (1) Apple iPhone, Sn#359314069107292 (further described in Attachment A1), (2) Samsung Galaxy Note 5 Cellular Phone, SKU: SPHN92032GLD UD, DEC: 256691584002629731 (further described in Attachment A2), (3) HP Laptop, SN#5CD430061Z (further described in Attachment A3), and (4) Canon Power Shot Camera, SN#252031028133 (further described in Attachment A4). On November 30, 2016, agents arrested former ICE HSI SA Tyrone Cedric Duren and his spouse Jennifer Lynn Duren, pursuant to a criminal complaint filed in the Southern District of California for violation of 18 USC 1956 (h) Conspiracy, 18 USC 1957 (a) Money Laundering, 18 USC 1957 (a) Money Laundering, 31 USC 5324 (a) Structuring Financial Transactions, 18 USC 1349 Conspiracy, and 18 USC 1001 False Statements (applied only to Tyrone Duren). Both Tyrone and Jennifer Duren were arrested as they arrived on an international flight from Melbourne, Australia at the Los Angeles Airport (LAX), Los Angeles, California. The following items were seized from the Durens; US passports, HP laptop computer, two cellular telephones, $1,242 US in cash, Canon digital camera, multiple banking cards and tax documents. A search warrant was also conducted at the Duren's residence in Bonsall, California.

2.    As set forth below, Tyrone C. Duren (hereinafter "Duren") is believed to be engaged in a pattern of tax evasion with respect to his business and his personal income tax returns. Duren currently owns 100% of Granite Hill properties, LLC

(hereinafter "GHP"), a property management company operated out of Duren's personal residence.  Duren previously (2007-2014), was a 50% owner with his business partner William Sanders.  As part of his tax evasion scheme Duren opened bank accounts, without the knowledge of his business partner, William Sanders (hereinafter "Sanders"), to divert income from GHP.  Sanders, who also owned 50% of GHP, alleged that Duren had embezzled over $1 million dollars from the company.  In addition, we have probable cause to believe that Duren used his position as a federal law enforcement officer to intercept and seize cash, known by Duren to be proceeds of drug trafficking, and use it for personal gain.  Bank deposits on Duren's accounts are inconsistent with what he reports on his business or personal income tax returns.  Duren's 2008 and 2009 tax returns do not appear to be correct as to every material matter.  Duren has not filed his business or personal income tax returns for the years 2010 through 2015.

    3.    The purpose for the warrant is to seize evidence, otherwise unattainable, related to the following statutes:

    a.    Title 26 USC § 7201: Evasion of Income Tax.

    b.    Title 26 USC § 7206(1): Filing a False Tax Return.

    c.    Title 26 USC § 7203: Willful Failure to File Tax Return.

    d.    Title 18 USC § 1956: Conspiracy to Commit Money Laundering.

    e.    Title 18 USC § 1956: Transactional Money Laundering.

    f.    Title 18 USC § 1001: False Statements to Federal Agents.

    g.    Title 31 USC § 5324: Structuring Financial Transactions to Evade Reporting Requirement.

    h.    Title 18 USC § 1014: Fraud or False Statements re: Loan and Credit Applications.

    i.    Title 18 USC § 1344: Bank Fraud.

j.     Title 18 USC § 1956: Racketeering: Laundering of Monetary Instruments.

k.     Title 18 USC § 1343: Fraud by wire

l.     Title 18 USC § 922:  Illegal Transportation and or Receipt of Firearms

4.     This is a joint investigation with U.S. Department of Homeland Security, Office of Inspector General (hereinafter "DHS-OIG"), the U.S. Immigration and Customs Enforcement, Office of Professional Responsibility (hereinafter "ICE-OPR"), U.S. Customs and Border Protection, Office of Professional Responsibility (hereinafter "CBP-OPR"), U.S. Treasury Department, Internal Revenue Service, Criminal Investigation (hereinafter "IRS-CI"),  and the Drug Enforcement Administration (DEA), Intelligence Division, Document and Media Exploitation Section (DOMEX) Analysts.

5.     The evidence of criminal activity set forth in this affidavit was obtained by me from various sources, including but not limited, to the analysis of bank, cellular phone, credit, escrow and title records, surveillance, information received from DHS-OIG, ICE-OPR, CBP-OPR, and IRS-CI, publicly filed documents, statements and documents provided by third parties, and information gained from my training and experience.  Because this affidavit is written and offered for the limited purpose of establishing probable cause for the issuance of a search warrant, it does not contain all of the information the government possesses regarding this investigation.

6.     As detailed herein, I have probable cause to believe that such offenses have been committed, and are still being committed by Duren.

## II

## **TRAINING AND EXPERIENCE**

7.     I am currently a Special Agent employed by United States Department of Homeland Security Investigations (HSI) since April 1996 and before that by the United States Border Patrol since September 1992. I am currently assigned to ICE-OPR, San Diego, California. I am a Federal Law Enforcement Officer within the meaning of Rule 41 (a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer since September 1992. I am authorized by Rule 41 (a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants pursuant to Rule 4 (a) and (c)(1), Federal Rules of Criminal Procedure.

8.     I have a B.S. in Criminal Justice from York College of Pennsylvania. I am a graduate of the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia.  As a result of my training and experience as a Homeland Security Investigations Agent and a Border Patrol Agent, I am familiar with federal and state criminal laws.  I have participated in numerous investigations related to corruption, financial crimes involving money laundering, mortgage fraud, bulk cash smuggling, narcotics and immigration violations, and the possession of illegal firearms.  I have been the affiant of numerous search and arrest warrants and participated in the searches of numerous residences and businesses involving federal and state criminal investigations.

9.     My knowledge of the facts alleged in this affidavit arises from my training and experience, my personal observations, my participation in the federal and investigation described herein, my conversations with other law enforcement agents involved in this investigation, and my review of records obtained during this investigation.  Because this affidavit is submitted for the limited purpose of securing

a search warrant as described herein, it does not include every fact known to me concerning the investigation. I graduated from the Federal Law Enforcement Training Center (hereinafter "FLETC") in Glynco, Georgia in 2006. At FLETC, I received training in, among other things, criminal law, constitutional law, financial investigation techniques and federal court procedures. I have also received training as to the legal principles and statutes representing criminal violations of the United States Code, applying for and executing search warrants, seizing evidence, firearms training, arrest procedures, and defensive tactics. As a Special Agent, I have participated in numerous investigations of financial crimes. I have conducted interviews, assisted in undercover operations, and conducted surveillance. I have participated in the execution of many search and arrest warrants seeking evidence such as financial records from residences and businesses. I have also consulted with other special agents who have conducted similar search warrants. These investigations focused on individuals deriving income from legal and illegal sources. As a result of my training and experience, and conversations with other special agents, I have become familiar with methods utilized by individuals and companies violating and attempting to violate the laws of the United States.

## III
## FACTUAL BACKGROUND

**A.    Source of the Investigation**

10.    In September 2013, the DHS-OIG received an allegation that Tyrone Duren, Special Agent, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), Oceanside, CA, conspired in a scheme to engage in bank and mortgage fraud, laundered and structured U.S. currency and evaded

payment of federal, state and property taxes in connection with a property management business he co-owned in the Philadelphia, PA area.

11.     In October 2013, the DHS-OIG received a secondary allegation that indicated that on July 18, 2013, Duren under the guise of a law enforcement seizure, stole over $400,000 in cash from a bulk cash transportation cell.

12.     The Department of Homeland Security reviewed records, conducted interviews and could locate no records indicating that Duren's actions were legitimate. The Department of Homeland Security obtained surveillance footage, data from a wireless tracking device (GPS tracker), cell site and toll data for Duren's cellular telephones, and information from two witnesses (CW1 and CW2).  The witnesses corroborated the information and further reported that Duren stole over $400,000 in cash that CW1 and CW2 were attempting to transport into Mexico from the United States (U.S.).

13.     The investigation corroborated the allegations and on September 8, 2014, four simultaneous search warrants were executed on Duren's personal residence, assigned government vehicle, and government and personal cellular telephones.  Among the items seized were approximately fifteen boxes of documents relating to over thirty real estate properties owned by Duren and his wife (Jennifer Duren), bank records and other documentary evidence.

14.     Immediately preceding the execution of the search warrants, Duren was interviewed and he made numerous false statements regarding his culpability in the theft of the funds from the illicit bulk cash transportation cell.  Duren was immediately placed on administrative duties pending the investigation.  Duren later requested and was granted 180 days of Leave Without Pay (LWOP), in order to attend to his rental property business in Philadelphia, Pennsylvania.

15.     On March 15, 2015, Duren resigned from his position as a Special Agent with HSI.  The charges in this case stem from the defendant's failure to file

tax returns, laundering currency from stolen drug proceeds, bank and wire fraud, false statements and structuring cash deposits and withdrawals in an effort to avoid scrutiny by the Internal Revenue Service.

**B.    Subject Background**

16.    Duren was formerly an ICE-HSI Special Agent and was employed from 2008-2014.  He was previously employed by the California Highway Patrol from 2005-2008.  In 2013, Duren was a GS-13 and his salary was approximately $109,000.  Duren is currently the sole owner of GHP, a property management company that rents homes/rooms to individuals directly and also to individuals who receive financial assistance through various federal and state financial assistance programs.  GHP's 2008 and 2009 tax returns (the most current tax returns filed by GHP) show net rental losses of ($30,662) and ($12,667), respectively.  Duren has been married to Jennifer since 1996. Jennifer has not been employed from 2008 through 2013.

17.    On July 21, 2015, Jennifer Duren filed her 2014 federal income tax return as a single person without any dependents.  Jennifer reported her occupation as being a "clerk" for Southwest Payroll Services, LLC, 27442 Portola Pkwy, Foothill Ranch, CA, and claimed to have earned $34,533 in 2014.  Jennifer listed her address as 1554 Corte Daniel, Oceanside, CA, which has been identified as the residence of Duren's parents.  Jennifer's previous tax return filed was for the year 2009 where she filed as married filing jointly with Tyrone Duren.

**C.    Granite Hill Properties,  LLC**

18.    In 2006, Duren entered into a business agreement with Sanders and formed GHP, LLC.  GHP was to be incorporated in the State of California, (where both Sanders and Duren reside), with the purpose to purchase homes and rent them out to low income people in Philadelphia, Pennsylvania for a profit.  According to Sanders, each partner was supposed to own 50% of the business.  Each partner was

to contribute equal amounts of money and/or property to GHP and similarly, the profits and losses were to be divided proportionally. In 2006, GHP purchased 6 properties; in 2007 GHP purchased another 6 properties; in 2010 GHP purchased 3 more properties; in 2011 another 4 properties were purchased; and in 2012, GHP purchased 1 property. Since the beginning of the partnership Duren has been in charge of GHP. For example, Duren hired people to fix the houses, opened bank accounts and collected and hired individuals to collect the rents due. One of those individuals was Martin Berg ("Berg"), who would collect and deposit the rental income into GHP business bank accounts. Duren was also in charge of filing the appropriate tax returns for GHP.

19. In late 2010, Sanders discovered that he was not listed as a manager or member on GHP's filing with the Secretary of State of California. Duren had made his wife Jennifer equal owner and manager of GHP. Duren refused to provide Sanders all of the financial records relating to GHP and as a result the judge hearing the civil lawsuit granted Sanders subpoena powers to obtain any and all the financial documents related to GHP. Documents subpoenaed from the financial institutions list Jennifer, instead of Sanders, as "co-owner" of GHP. Sanders also discovered that Duren had at least five hidden business bank accounts. Sanders believed that Duren had been using these bank accounts to hide the true income of GHP and to purchase other properties for his personal benefit.

20. In 2011, Duren and Sanders had a falling out based upon funding and work contributions. In 2011, Duren filed a civil lawsuit against Sanders in Philadelphia, Pennsylvania for the sole ownership of the business. Shortly thereafter, Sanders countersued for his share of GHP profits.

21. In 2012, Duren purchased at least 9 other properties titled under his name or U.S. Holding, LLC, a company owned by his wife, Jennifer.

22.　According to the 2011 complaint filed by Duren against Sanders:

"In 2006, Mr. Duren ...performed all its (GHP's) management duties."

"In 2007, Mr. Duren ...performed most, if not all, of the management duties."

"In 2008 ...all management duties were performed by Mr. Duren and his wife..."

"In 2009 ...all of the management duties were performed by Mr. Duren and his wife."

"In 2010 ...approximately 80% of the management duties were performed by Mr. Duren and his wife."

23.　According to Sanders, he had requested from Duren all books, accounts, rent rolls, lease agreements and records in his possession related to GHP but Duren refused to provide them.

24.　The 2007, 2008, and 2009, GHP federal income tax returns show that Duren and Jennifer are the sole and equal owners of GHP. Both, Duren and Jennifer received Forms K-1 from GHP for the referenced years.

25.　According to Duren's 2013 ICE-HSI Background Investigation records, Duren stated that he was going to file his 2010 and 2011 federal income taxes no later than Wednesday, February 23, 2013. Duren further stated that he had not filed because Sanders refused to provide the necessary documents to complete the tax returns. The investigation showed that Duren was in charge of all GHP's finances and had all the necessary documents to properly prepare his tax returns. As of the date of this affidavit, Duren has yet to file GHP's or his personal federal income tax return for the years 2010 through 2015.

26.　On June 10, 2015, a settlement motion was granted by the United States Bankruptcy Court in the Central District of California, in which Duren agreed to make a $55,000 down payment and pay $4027.78 monthly to a trustee from June 10, 2015 to May 10, 2018 and thus became the sole owner of GHP.

## Depositions

27.    On November 20, 2013, Jennifer was deposed as part of the civil lawsuit and stated the following: Jennifer was the primary bookkeeper for GHP.  In 2006, 2007, 2008, and 2009 and at least up to the date of her deposition, she did of all the data entry for GHP.  Jennifer used software called "Tenant File" and entered all the information onto a computer.  She used the computer to generate reports relating to GHP.  Jennifer had signing authority on at least one GHP bank account.  Jennifer is aware that GHP owns three bank accounts at Wells Fargo bank.  Duren formed other LLCs, including but not limited to U.S. Holdings, LLC; Granite Hill Properties 2, LLC; Equity Funding Group, LLC and Real Estate Group, LLC, to purchase additional homes.  Jennifer Duren has been listed as the co-signer on the GHP bank accounts.  U.S. Holdings, LLC owns at least 6 properties that were purchased with Jennifer's personal funds.  Jennifer stated that the cash to purchase these properties came from a safe in their home and that Duren had put the money in there for her. She did not know from where the cash came from.

28.    On May 1, 2014, Duren was deposed and he stated the following: He has tens of thousands of sheets of papers relating to GHP which were scanned into a computer.  He uses the software Tenant File to track GHP's business transactions including the money coming in and out.  Duren bought a stand-alone computer for Jennifer to input all the data.  This is a computer that she uses at home. Jennifer enters the receipts, bank records, escrow and all the financial information, including the source of all the funds, into the computer.  Duren has access to the computer and does input some of GHP's financial information.  Duren provided print outs of the Tenant file reports to his tax return preparer.

29.    In September 2010, Duren agreed with Sanders to each contribute, over the course of the 18 months, $400,000 in cash, capital, or credit to GHP.  Sometime between the date of the agreement and December 2013, Duren deposited at least

$240,000 into a Chase bank account and an additional $200,000 into a Wells Fargo bank account titled under GHP.  Funds in a U.S. Holding bank account belong to Jennifer (although the account is titled under GHP).  The homes titled under U.S. Holding Properties, LLC or Equity Funding Group were purchased with Jennifer's money from her own bank account.  Duren received an unspecified amount of cash from Jennifer in exchange for the funds and control of the Chase Bank and Bank of America accounts titled under GHP.  Duren stated that GHP has not made money and is operating at a loss.

**Financial Institutions**

30.    According to Citibank records, Duren submitted a business account application for GHP on May 26, 2011, where he declared that GHP annual sales were $1.3 million and net profits were $600,000.

31.    According to Wells Fargo Bank records, in November 2011, Duren submitted a business account application for GHP at a branch in Philadelphia, Pennsylvania.  In the application, Duren declared that GHP's gross income for the year 2009 was $260,000.  However, in the 2009 income tax return for GHP, filed by Duren, he declared to the IRS, under penalty of perjury, that GHP's gross income was only $74,950 with a net loss of $12,667.

**Cash Deposits**

32.    A preliminary review of bank account information by agents revealed the following amounts cash were deposited into Duren's personal or business bank accounts by Tyrone Duren, Jennifer Duren and/or Martin Berg:

2011        $452,860.27

2012        $397,657.59

2013        $219,304.00

2014        $196,754.80

Combined Preliminary Cash Only Deposits Total (2011-2014): $1,266,576.66

33.    It was alleged that on July 18, 2013, Duren under the guise of a law enforcement seizure, stole over $400,000 in cash from a bulk cash transportation cell. In September 2013, ten transactions that totaled $67,600 in cash were deposited into Duren's personal and/or business bank accounts and on October 09, 2013, Duren walked into a Union Bank of California branch and deposited $70,000 in $100 denominations as an escrow down payment to purchase a home.  The cash was bundled with rubber bands and stored in a backpack.  Duren represented to the bank that the funds were from his company, U.S. Holdings Prop, LLC.  On December 27, 2013, Duren also paid $50,000 in cash for legal services.

34.    As illustrated above, Duren has made numerous large cash deposits.  On June 13, 2014, he deposited $35,000 in cash at a Bank of America branch in San Diego, California.  On July 9, 2014, Duren paid $76,000 in cash for legal services. During the search warrant conducted on September 8, 2014 at Duren's residence, agents seized a total of $13,700 in $100 bill denominations.  The cash was found in a box on a shelf that contained Christmas cards ($4600), in a safe ($7500) and in the trunk of the Hyundai Sonata within the owner's manual pouch ($1600).

35.    As previously noted, Duren was a former special agent for ICE HSI and was employed from 2008 to 2014.  He was previously employed by the California Highway Patrol (CHP) from 2002 to 2007.  In 2013, Duren was a GS-13 and his annual salary was approximately $109,000.  Duren received his salary payment through direct deposit. The large amounts of cash handled and deposited by Duren are inconsistent with his line of work and with the income reported on his tax returns.

**Structuring**

36.    A review of Citibank, N.A. bank records showed that between June 1, 2011 through October 22, 2012, Duren and his wife, Jennifer L. Duren, conducted 20 transactions in which they deposited $146,156 U.S. dollars in cash into Citibank N.A. business checking account 204115364 and Citibank N.A. personal checking

account 001747466020. These deposits were made at three Citibank N.A. banks located at: 4120 Oceanside Blvd. Suite 119-125, Oceanside, California; 1745 W Florida Avenue, Hemet, California; and 44-480 Town Center Way, Palm Desert, California. Further review showed that the 20 cash deposits were primarily transacted in whole round dollar amounts, under the currency transaction reporting threshold and at times deposited during a short period of time, such as consecutive and/or alternating days, and thus appeared to be structured for the purpose of evading the Currency Transaction Report (CTR) reporting requirements of 31 CFR 103.22.

37. A review of Citibank N.A. business checking account 204115364 records showed that it was titled in the name of Granite Hill Properties LLC, was established on May 27, 2011 and identified Tyrone and Jennifer Duren as signers on the account that was closed by Citibank N.A. on February 28, 2013.

38. A review of Citibank N.A. personal checking account 40037345408, showed that it was titled in the name of Tyrone and Jennifer Duren, was established on March 15, 2012 and identified Tyrone and Jennifer Duren as signers on the account that was closed by Citibank N.A. on October 22, 2012.

39. A preliminary review by agents of Duren's business and personal bank accounts indicated that in 2011, approximately $290,493 and in 2012, approximately $251,023 in cash deposits were primarily transacted in whole round dollar amounts, under the currency transaction reporting threshold and were deposited into different business and/or personal bank accounts on the same day, and thus appeared to be structured for the purpose of evading the Currency Transaction Report (CTR) reporting requirements of 31 CFR 103.22. The table below illustrates a sample of the cash deposits into Duren's business and personal bank accounts that appear to be structured between May and June of 2011.

| 2011 Cash Deposit Transactions by Date and Bank Account (Sample) | | | | | |
|---|---|---|---|---|---|
| TRANSACTION DATE | BANK | ACCOUNT | ACCOUNT OWNER | AMOUNT DEPOSITED | TOTAL CASH DEPOSITED (SAME DAY) |
| 5/25/2011 | Chase | xxx- 6765 | GHP | $1000 | |
| 5/25/2011 | Wells Fargo | XXX-0581 | GHP | $1500 | |
| 5/25/2011 | Wells Fargo | XXX-0581 | GHP | $4000 | $19,500 |
| 5/25/2011 | MFCU | XXX-4645 | T & J DUREN | $4000 | |
| 5/25/2011 | Chase | XXX-2329 | GHP | $9000 | |
| 5/26/2011 | B of A | XXX-7859 | GHP | $9850 | |
| 5/26/2011 | B of A | XXX-7716 | GHP | $9950 | $19,800 |
| 5/31/2011 | B of A | XXX-7716 | GHP | $3000 | |
| 5/31/2011 | Chase | XXX-2329 | GHP | $6000 | $9000 |
| 6/1/2011 | Citibank | XXX-5364 | GHP | $3290 | |
| 6/1/2011 | B of A | XXX-2329 | GHP | $7000 | $17,690 |
| 6/1/2011 | B of A | XXX-7716 | GHP | $7400 | |
| 6/6/2011 | Wells Fargo | XXX-9703 | GHP | $5000 | |
| 6/6/2011 | Citibank | XXX-5364 | GHP | $7040 | $29,780 |
| 6/6/2011 | Chase | XXX-2329 | GHP | $8480 | |
| 6/6/2011 | B of A | XXX-7716 | GHP | $9260 | |
| 6/7/2011 | Chase | XXX-2329 | GHP | $3800 | |
| 6/7/2011 | B of A | XXX-7716 | GHP | $7000 | $20,000 |
| 6/7/2011 | Citibank | XXX-5364 | GHP | $9200 | |
| 6/9/2011 | Citibank | XXX-5364 | GHP | $7000 | |
| 6/9/2011 | Chase | XXX-2329 | GHP | $7100 | $14,100 |

## D.  **Immigration and Customs Enforcement (ICE) Illegal Seizure(s)**

40.     During an interview with agents, CW1, a civilian and Mexican citizen, made an allegation that on or about July 18, 2013, an unknown African American male later identified as Duren, under the guise of a law enforcement seizure, stole an undetermined amount of illicit currency (estimated $400,000 U.S. dollars) from a vehicle that CW1 was driving.

### **Duren Installed an Electronic Vehicle Tracker**

41.     On July 17, 2013, CW1 drove a silver Honda Odyssey van, with Mexican license plate AKP4696, across the international border at the Otay Mesa Port of Entry (hereinafter "OTM POE"), San Diego, California, with the purpose of driving to an area near Los Angeles, California to pick up an unknown amount of money.  CW1 stated that the money would be concealed in an aftermarket roof compartment of the van and he intended to deliver it to an unknown subject in Mexico. As CW1 applied for entry into the United States, he was referred to the

secondary vehicle inspection area by a Customs and Border Protection Officer (hereinafter "CBPO"). CW1 stated he was detained in a security office for four hours while the Honda Odyssey van he drove was inspected by CBPO's in the secondary vehicle inspection area. CW1 believed that the CBPO's at the OTM POE had located the false compartment in the van and had placed an electronic vehicle tracker on the van because he had spent so much time waiting at the secondary vehicle inspection area. Once CW1 was released from the OTM POE by CBPOs, he immediately returned to Mexico because he feared that U.S. law enforcement officers would be monitoring the van. CW1 said his boss told him he would have to drive the van again the following day to Los Angeles, California.

42. On July 18, 2013, CW1 entered into the United States from Mexico through the OTM POE without being referred to secondary inspection and then drove to the Chula Vista Mall, Chula Vista, California, where he met with CW2. CW1 and CW2 drove northbound towards Los Angeles, California. CW1 and CW2 drove to a Starbucks coffee shop near Del Amo Boulevard, Cerritos, California. CW1 parked the Honda Odyssey van at a parking lot near the Starbucks and an unknown individual took the Honda Odyssey van to an unknown location to conceal money within the aftermarket roof compartment. After approximately half an hour, CW2 received a phone call from an unknown person who indicated that the Honda Odyssey van was ready to be picked up at the parking lot of a Ralph's grocery store, approximately one block away from the Starbucks coffee shop. CW1 and CW2 picked up the van at the Ralphs parking lot and drove southbound on Interstate 5 to return to Mexico.

**Duren seizes bags of U.S. Currency**

43. As CW1 and CW2 drove southbound on Interstate 805 and passed the California State Route 905 interchange, he noticed what appeared to be a silver Dodge Edge sport utility vehicle (hereinafter "SUV") in the rear view mirror,

approaching from behind at a high rate of speed. CW1 and CW2 noticed what appeared to be blue and red police lights flashing from where the rear view mirror would be placed within the SUV. (AGENTS NOTE: Duren had a silver GMC Acadia as his assigned government vehicle.)

44.    CW1 drove the Honda Odyssey van to the right shoulder of Interstate 805, right before the East San Ysidro Boulevard Exit, and the driver of the SUV motioned with his hand for CW1 to keep driving southbound onto the East San Ysidro Boulevard exit off ramp. CW1 parked the Honda Odyssey van on the right side of the East San Ysidro Boulevard off ramp exit. The driver of the SUV, an African American male, parked behind CW1exited his vehicle, and approached the Honda Odyssey van from the driver's side and stated in the English language, "I smell something, I know there is something. It better not be guns because there is nothing I can do about that but if it is money I can write some paperwork and let you go." The unknown African American male told CW1 if he had money concealed within the vehicle he would let him go but further stated that the CW1 would have to sign some paperwork before he allowed him to return to Mexico. The unknown African American male never identified himself as a law enforcement officer. CW1 recognized the unknown African American male because he had seen him the previous day at the OTM POE as the CW1 was waiting for the Honda Odyssey van to be inspected in the secondary inspection lot.

45.    CW1 gave the unknown African American male his passport card, CW2's passport card, and the keys to the Honda Odyssey van. The unknown African American male took CW2 from the passenger seat of the van, handcuffed him, and placed him in the front passenger seat of the SUV. The unknown African American male then told CW1 to step out of the van, handcuffed him, and placed him in the driver's side rear passenger seat of the SUV. The unknown African American male walked to the Honda Odyssey van with a large box in his hand,

opened the hood of the van, and took something out from the engine compartment and placed it in the box. The unknown African American male returned to the SUV and placed the box into the rear compartment of the vehicle. CW1 was not sure what the unknown African American male took from under the hood of the Honda Odyssey van, but surmised that it may have been a global positioning system (GPS) device used to monitor the location of the vehicle. The unknown African American male told CW2 to telephonically call the individual who could tell them how to open the aftermarket compartment in the Honda Odyssey van. CW2 called an unknown individual and received instructions on how to open the aftermarket roof compartment. The unknown African American male then turned on the Honda Odyssey van, followed the aforementioned instructions, and a rooftop compartment on the rear of the Honda Odyssey van opened. CW1 observed the unknown African American male take out three plastic transparent bags filled with what appeared to be U.S. currency from the rooftop aftermarket compartment on the Honda Odyssey van. CW1 observed the unknown African American male throw the plastic bags filled with money onto the dirt on the right side of the Honda Odyssey van.

46. The unknown African American male took the hand cuffs off of CW1 and CW2 and told them to get back in the Honda Odyssey van and meet him at the Bank of America parking lot, which was located to the immediate right after the East San Ysidro Boulevard off-ramp exit. The unknown African American male told CW1 he would return their passport cards and they would be released from the Bank of America parking lot after they signed some paperwork.

**Duren drives to the Bank of America Parking Lot**

47. CW1 drove to the Bank of America parking lot and the unknown African American male arrived at the same parking lot approximately one minute later. The unknown African American male took a picture of CW1's face and his identification card with a cellular telephone and told him to place his finger on the

same phone he used to take his picture so that he could capture his fingerprint. The unknown African American male did not take any pictures or fingerprints of CW2. CW1 was never provided any paperwork and the African American male told him to "just tell his boss that he was stopped by the Highway Patrol." CW1 and CW2 returned to Mexico. (AGENTS NOTE: It is standard operating procedure that when a seizure occurs of any property to include currency, the subject is provided a Government Form 6051 documenting the seizure. It is the writer's experience that Drug Transportation Organizations know about this form and will ask the subject from whom the money was seized for this form as proof that they did not steal the currency.)

48.    In separate interviews, Agents provided CW1 and CW2 with a photographic array of six photographs of African American males, one of whom was Duren. CW1 identified photograph number four (Duren), as the unknown African American male he observed on July 17, 2013 at the OTM POE and the same person who conducted the vehicle stop of the Honda Odyssey van on July 18, 2013. CW2 identified photograph number four (Duren), as the unknown African American male who conducted the vehicle stop of the Honda Odyssey van on July 18, 2013.

**Bank of America Security camera(s)**

49.    A review of video provided by the Bank of America, located at 201 East San Ysidro Boulevard, San Ysidro, CA, revealed video footage of Duren driving a silver SUV and meeting with the silver Honda Odyssey van driven by CW1 on July 18, 2013, from approximately 8:02 p.m. to 8:09 p.m. At one point, CW2 exits the van and walks across the parking lot. The silver Honda Odyssey van is seen departing from the Bank of America parking lot at 8:09 p.m. in the video.

50.    DHS, TECS (Treasury Enforcement Communication System) records revealed that the silver Honda Odyssey van with Mexican license plate AKP4696, drove south through the San Ysidro Port of Entry, San Ysidro, California, into

Mexico at 8:12:53 p.m. on July 18, 2013.  These times are consistent with the
distance to the Port or Entry.

**Electronic Vehicle Tracker BCS 164**

51.    A review of GPS trackers assigned to Duren, from the Bulk Cash
Smuggling Center (hereinafter "BCSC") located in Williston, Vermont, revealed
tracker number BCS 164 was operational on July 17 and 18, 2013.  The BCSC
operates 24 hours a day providing real-time tactical intelligence, investigative
support, and expertise in the transportation and smuggling of bulk cash.  The BCSC
issued numerous GPS vehicle trackers to Duren, including tracker number BCS 164.
An analysis of the stored location information from the tracker matched the story
given by CW1 as far as the route and times of travel.  The stored information also
shows numerous pings or hits indicating that the tracker was stationary on the East
San Ysidro Boulevard exit during the time frame of the vehicle stop. The last ping
occurred at 8:03 p.m. on July 18, 2013, indicating that the tracker was turned off or
ran out of battery power.

**Duren's emails**

52.    On Thursday, July 18, 2013 at 7:34 a.m., the following email was sent
from Duren's government email account to BCSC Program Manager Samuel Briggs.
Subject: BCS 164 (Verbatim) "I not sure how to get this out of failure.  Yesterday, it
was placed on a vehicle at POE with a huge electronic roof compartment.  I set it up
then placed it after getting a reading but it shows it never left POE.  It left and has
already probably returned to Mexico. We will recover on return."

53.    On Thursday, July 18, 2013, at 11:32 a.m., BCSC Program Manager
Samuel Briggs responded to the email from Duren. Subject: BCS 164 (Verbatim)
"Looks like it pinged at 10:50 PST with a good location.  Since then it has had six
pings with no lat long."

**Duren's Cellular phones**

54.    An analysis of cellular phone tower data relating to incoming and outgoing calls, to and from Duren's assigned government Verizon cellular phone (760-427-4354) and his personal Sprint cellular phone (760-458-8966), reflected four phone calls hitting on a cellular site tower on San Ysidro Boulevard, a few hundred yards from the San Ysidro Boulevard exit and the Bank of America where Duren allegedly performed the vehicle stop.  The four phone calls hit the cellular tower between 8:04 p.m. to 8:10 p.m. on July 18, 2013.

55.    A review of internal federal law enforcement communication and reporting systems, utilized to conduct and document a vehicle stop and seizure for July 18, 2013, were negative. Records of a stop of a vehicle displaying Mexican license plate, AKP4696, or any individuals with CW1 or CW2's name, or records of any seizure of monetary instruments were also negative.  The review included checks through Sector Communications, TECS, SEACATS, LESC/NIN, U.S. Border Patrol dispatch and EPIC.

56.    A review of the records did show that on July 17, 2013, CBP Officers at the OTM POE documented that the silver Honda Odyssey van, with Mexican license plate AKP4696, driven by CW1, was referred to secondary inspection.  The referral was documented in the remarks section of an official record with the following, (verbatim) "vehicle was escorted into secondary for inspection, k-9 alerted to the vehicle, discovered non-factory compartment, tracker was placed in vehicle by s/a duran, BP agent on phone was up-dated  who record  owner on silent hit for driver, released and admitted north. X-Ray/N1I Utilized for this Inspection."

57.    The analysis of cellular phone tower data relating to incoming and outgoing calls, to and   from Duren's assigned government Verizon cellular phone (760-427-4354) and his personal Sprint cellular phone (760-458-8966), reflected approximately twenty phone calls hitting on cellular phone towers near the OTM

POE on July 17, 2013 between 10:10 a.m. and 1:00 p.m.  This is the general timeframe when agents believe that Duren installed a tracker (BCS164) on the silver Honda Odyssey van, with Mexican license plate AKP4696, driven by CW1.

58.     On July 17, 2014, at 16:45 Eastern Standard Time (EST), CBP Program Manager Renner created a TECS alert for the silver Honda Odyssey van, with Mexican license plate AKP4696.  In the remarks section of the alert, CBPO Renner wrote, "vehicle has a non-factory compartment in roof used for bulk cash/narcotics. If found in any violation contact HSI Tyrone Duren via San Diego Sector."

59.     Renner is assigned to the Customs and Border Protection (CBP) National Targeting Center (NTC), in Reston, Virginia.  A review of Duren's cases revealed that CBPO Renner did the majority of the intelligence workups and targeting of subjects and vehicles.  Duren and CBPO Renner communicated multiple times daily via telephone and email in reference to smuggling cases.

60.     A review of phone tolls for July 18, 2013 revealed there were seventeen (17) calls or text messages between Duren's personal Sprint cellular phone (760) 458-8966 and (215) 888-2216, subscribed to CBPO Renner.

61.     Phone tolls revealed that a phone call was made from Duren's personal phone, Sprint phone number (760) 458-8966 to (215) 888-2216, subscribed to CBPO Renner at 8:04:54 p.m. to 8:07:30 p.m.  The duration of the phone call was two minutes and thirty six seconds.  Video from the Bank of America showed that Duren appeared to be speaking on a phone during that same time frame as he was sitting in his government vehicle, a silver GMC Acadia.

**Interview with CBP Program Manager Renner**

62.     During an interview with agents on July 31, 2014, CBPO Renner stated that on July 17, 2013, he was contacted by Duren, when Duren was at the OTM POE.  Duren informed CBPO Renner that a Honda Odyssey van was being inspected and that an empty non-factory compartment was located in the roof of the vehicle.

Duren provided CBPO Renner with the license plate and driver information, which resulted in CBPO Renner placing a record in TECS on the vehicle. Duren also sent a text message to CBPO Renner of a photo of the driver's non-immigrant Visa (CW1), and license plate information. CBPO Renner was also in communication, via text messages, with Duren on July 18, 2013, during the traffic stop of the Honda Odyssey van. Duren told CBPO Renner that he had placed a GPS tracking device on the vehicle and provided CBPO Renner with tracker login information to the GPS tracker website (Autofind). CBPO Renner was monitoring the tracker on July 17, 2013 as well as July 18, 2013.

63.     On July 18, 2013, while monitoring the tracker, CBPO Renner notified Duren that the vehicle was near Duren's office in Oceanside, California and was heading southbound on Interstate 5. Through phone calls and text messages, CBPO Renner was aware that Duren followed the vehicle and that the vehicle was stopped. CBPO Renner does not know who stopped the vehicle but knows that Duren was present during the stop. In communication, via stored text messages during the traffic stop, Duren wrote "they bustered the roof." CBPO Renner said that this message indicated that either CBPOs or BPAs were also on the vehicle stop and had equipment which could test for density readings on a vehicle to determine if contraband was present. Duren also informed CBPO Renner via text messages that the vehicle was stopped and that the driver was "not alone." Duren informed CBPO Renner, via text message, that "they" were getting a normal reading from a density buster. CBPO Renner told Duren, via text messages, to find an access and visually inspect the compartment. It was CBPO Renner's understanding that illicit contraband was not found in the silver Honda Odyssey driven by CW1.

**Duren's Currency Seizures**

64.     A review of Duren's cases revealed that he has over 40 currency seizures, over the last 5 years, totaling over 20 million dollars. CBPO Renner

recalled two seizures in year 2011, when Duren drove from San Diego, California to the Calexico POE, Calexico, California, to pick up seized currency. Duren later told CBPO Renner that the bags containing the money had cuts in them and money was missing. CBPO Renner also recalled other vehicle stops that were suspiciously similar to the vehicle stop on July 18, 2013, and he was told by Duren they were negative for a seizure of currency. According to Renner and additional documentation, in a lot of the cases, the seized currency was turned over to Duren's possession, stored at a secure location in his office located in Oceanside, California and not officially counted until a few days later at a financial facility.

**Interview with Border Patrol Agent**

65.    A review of phone tolls for July 18, 2013, revealed four (4) calls between Duren's assigned government Verizon cellular phone (760) 427-4354 and (714) 310-2869, a cellular phone belonging to Border Patrol Agent (BPA) Aron Marcellus. The El Cajon Border Patrol Station and BPA Marcellus had an alien smuggling investigation open on CW1 and had an alert on him in TECS.

66.    On July 17, 2013, due to his alert in TECS, BPA Marcellus was contacted by CBPOs at the OTM POE regarding CW1 having made an entry through the POE as the driver of a vehicle with an empty aftermarket compartment. CBPOs told BPA Marcellus that Duren had responded to the POE and placed a tracker on the vehicle. BPA Marcellus contacted Duren and Duren informed him that he had removed the tracker from the vehicle and was no longer interested in CW1.

**Duren's Denial**

67.    During the month of June 2014, investigating agents initiated fifteen emails and six consensually recorded phone calls to Duren from a BPA and a CHP Investigator cooperating in the investigation. In the emails and phone calls, the BPA and a CHP Investigator, under the ruse of an ongoing investigation, attempted to question Duren to determine if Duren placed a tracker on the silver Honda Odyssey

and had any knowledge of the alleged vehicle stop involving CW1 on July 18, 2013.
Duren provided an email to the CHP Investigator with information on all the trackers
that were active during the same time period as the alleged vehicle stop. As agents
were remotely monitoring Duren's government computer, Duren constructed an
email with photos and tracking information that was not associated with the alleged
vehicle stop. As Duren was working on the email, he searched all of his stored
emails and files for any information for tracker number BCS 164 or any information
relating to CW1. Duren also reviewed all the emails from the BPAs referencing the
alleged vehicle stop on July 18, 2013. Agents believe that Duren intentionally
created this diversion and provided false information to the BPA and CHP
Investigator to hinder the investigation and lead them away from the truth. At no
time during any of these email or phone call exchanges did Duren acknowledge that
tracker BCS 164 was the tracker that he used to monitor the silver Honda Odyssey
van on July 17-18, 2013. Ultimately, during the consensually recorded telephonic
intercepts, Duren denied that he ever installed a tracker on the silver Honda Odyssey
van with Mexican license plate AKP4696. Duren also stated that the only time he
ever came in contact with the silver Honda Odyssey van was on July 17, 2013, at the
OTM POE. Duren stated that he had no further contact with CW1, the driver of the
silver Honda Odyssey, on July 17, 2013 and July 18, 2013. Duren stated that he did
not know anything about the Honda Odyssey van ever being stopped by any law
enforcement entity on July 18, 2013.

**Interview of Duren**

68.     On September 8, 2014, agents conducted an interview of Duren at the
HSI Office in Oceanside, California. In summary, Duren stated that he knew what
the interview was about and explained how he previously told CHP Investigator
Clinkscales and Border Patrol Agent Foreman that he never installed a tracker or
later stopped a silver Honda Odyssey van with Mexican license plate AKP4696.

Duren also stated that the only time he ever came in contact with the silver Honda Odyssey van was on July 17, 2013, at the OTM POE when an empty compartment was discovered in the roof of the Honda Odyssey van.  Duren stated that he initially intended to place a tracker on the van but when the tracker failed to work he changed his mind and it was never installed.  Duren stated that he had no further contact with the driver of the silver Honda Odyssey on July 17, 2013 and July 18, 2013.  Duren stated that he did not know anything about the Honda Odyssey van ever being stopped by any law enforcement agency on July 18, 2013.  Duren stated that the last time he had conducted a vehicle stop was in 2008.  When Duren was presented with the evidence of the historical tracker data that matched the witness' story and the cell tower phone pings which placed him at the scene of the vehicle stop, Duren became very agitated and the interview was ultimately terminated.  Duren was presented with search warrants for his personal and government issued cellular phones, his government vehicle, and his home located at 31241 Old River Road, Bonsall, California.  Duren was immediately placed on administrative duties pending the investigation.  Duren later requested and was granted 180 days of Leave Without Pay (LWOP), in order to attend to his rental property business in Philadelphia, Pennsylvania.  On March 15, 2015, Duren resigned from his position as a Special Agent with HSI.

**Evidence from Duren's phones (1st Search Warrant, September 8, 2014)**

69.    A review of the evidence downloaded from Duren's government cellular phone revealed some of the text messages between Duren and CBPO Renner, on the days of the tracker installation and vehicle stop, July 17-18, 2013.

70.    During the interview with CBPO Renner on July 31, 2014, CBPO Renner showed interviewing agents all the text messages on his phone that occurred between him and Duren, regarding the silver Honda Odyssey van with Mexican license plate AKP4696.  Some of the text messages seen in CBPO Renner's phone,

included photographs that were sent to CBPO Renner by Duren of the driver's Border Crossing Card and of the CBP Secondary Inspection Referral Form for the silver Honda Odyssey van with Mexican license plate AKP4696. A review of Duren's government iPhone showed that the aforementioned photographs and text messages that were sent to CBPO Renner appear to have been deleted. There were only eleven photographs found in Duren's government issued iPhone. The photographs that Duren sent CBPO Renner on July 17, 2013 were not located in Duren's government iPhone.

71.     A review of the evidence downloaded from Duren's personal cellular phone revealed text messages dating back to August 5, 2013. There were notes annotated in the calendar section dating back to October 22, 2011. A review of stored text messages from CBPO Renner's cellular phone revealed that there were text messages between Duren and CBPO Renner regarding the vehicle stop sent to Duren's personal cellular phone. This may indicate that the text messages dating before August 5, 2013 were permanently deleted on Duren's phone before it was seized.

**Duren's Government Computer Records**

72.     A review of recorded screen shot pictures of Duren's government computer revealed that on August 29, 2014, at 1:40 p.m., a hard drive was connected to Duren's government computer. The hard drive registered on the computer as "Pocket (F)", and revealed that it stored four phone files. One of the files was recorded as "UFED Apple iPhone 4S 990002660188804." (AGENTS NOTE: Apple iPhone 4S IMEI# 990002660188804 was the government iPhone issued to Duren and was seized by agents pursuant to a search warrant on September 8, 2014.) The next recorded action shows that file "UFED Apple iPhone 4S 990002660188804" was opened by the user on Duren's computer. The recorded screen shot picture of that action revealed the different files stored from Apple iPhone 4S IMEI#

990002660188804 to include attachments, images, and numerous stored records of use.

73.    The next recorded screen shot picture shows that a file in the attachments named "0" was opened revealing a photograph of the Border Crossing Card that belonged to CW1.

74.    The next two recorded screen shot pictures show that the user viewed the properties for the photograph of the Border Crossing Card that belonged to CW1.

75.    The next recorded screen shot picture shows that the user viewed the history for the two messages that Duren sent to CBPO Renner's cellular phone containing the photograph of the  Border Crossing Card for CW1 and the photograph of the CBP Secondary Inspection Referral Form for the silver Honda Odyssey van with Mexican license plate AKP4696.

76.    The next recorded screen shot picture shows that the user viewed the Phone Examination Report for Apple iPhone 4S IMEI# 990002660188804.

77.    The next recorded screen shot picture shows that the user viewed the photograph of the CBP Secondary Inspection Referral Form for the silver Honda Odyssey van with Mexican license plate AKP4696.

78.    The next recorded screen shot picture shows that the user viewed the text messages regarding the days of the GPS tracker install and vehicle stop, July 17-18, 2013.

79.    The next recorded screen shot picture shows that the user connected the actual Apple iPhone to Duren's government computer and permanently deleted 113 items/photographs from the Apple iPhone's internal storage.

80.    The next recorded screen shot picture shows that the user copied 5,580 items from the hard drive registered on the computer as "Pocket (F)" to "TCDuren (H:)".  (AGENT NOTE: The "(H:)" drive is the hard drive on the HSI computer network that was assigned to Duren.)

81.     The next recorded screen shot picture shows that the user deleted 5,580 items from the hard drive registered on the computer as "Pocket (F)".

**Guns purchased by Duren**

82.     A search warrant conducted on September 8, 2014, at Duren's residence revealed that Duren purchased a pistol with a silencer/suppressor in Philadelphia, Pennsylvania even though he was a resident of California.  Photos were also found in Duren's personally owned cellular phone of what is believed to be Duren firing a pistol with a silencer/suppressor into a dirt berm in the basement of his home in California.

83.     Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Agents in Philadelphia, Pennsylvania stated that Duren was able to purchase the silencer/suppressor in Pennsylvania by using his LLC, which is based in Pennsylvania and paying a special fee to ATF.  This did not permit Duren to transport or possess the silencer/suppressor in California.  Agents believe that Duren transported the Sig Sauer .22 with the silencer/suppressor on a plane from Philadelphia, Pennsylvania to San Diego, California by using his Federal Agent Credentials to pass through airport security without being inspected.  Duren has six handguns registered in his name.  None of the weapons owned by Duren were found during the search warrant conducted on September 8, 2014 at Duren's residence in California.  The locations of these weapons are unknown at this time.  Duren also purchased a shotgun and expressed interest in purchasing an assault weapon. (AGENTS NOTE: Silencers/suppressors are illegal in California.)

**Mortgage Fraud**

84.     In 2004, Duren and his wife, Jennifer Duren, originally purchased the land and obtained a construction loan for his home located at 23722 Monet Way, Sun City, California 92586.  (Agent Note: Different loan or banking documents regarding the property located at 23722 Money Way, list the city as either Sun City or

Romoland, California 92586. This affidavit lists both examples of the address depending from which document the information originated ).

85.     In 2005, Duren refinanced his loan for $405,000 as "a married man/sole and separate property." Jennifer Duren was not listed on the loan or title.  Duren received $53,000 Debt Consolidation/Cash out from the refinance.

86.     In 2006, Duren obtained a second home mortgage loan for $111,000 on his home located at 23722 Monet Way, Sun City, California 92586.  Duren stated on his loan application, dated August 31, 2006, that he had not declared bankruptcy in the last seven years.  Duren declared bankruptcy on October 22, 1999, which was two months short of the seven year requirement.  A review of bank account information revealed that as a result of taking out a second home mortgage loan, $89,464.31 was wired to Duren's and Jennifer Duren's joint account at Mission Federal Credit Union Bank.  Duren purchased six rental properties in Philadelphia, Pennsylvania with the money received as a result of taking out a second home mortgage loan.

87.     In 2006-2007, Duren purchased twelve rental properties in Philadelphia, Pennsylvania.

88.     On September 4, 2007, Duren refinanced his personal residential mortgages ($405,000 and $111,000) with Flagstar Bank for $620,000.  Duren received $101,826 cash out and the rest was used to pay off the remaining balance on the previous personal residential mortgages.  Duren failed to disclose two properties on the loan application submitted to Flagstar Bank on July 31, 2007.  The two undisclosed properties are 2317 Dickenson St, Philadelphia, Pennsylvania purchased on June 4, 2007 and 2037 Wilder Street, Philadelphia, Pennsylvania which was obtained on July 10, 2007.  The undisclosed properties did not appear on Duren's credit report because of short time gap between the purchase of the undisclosed properties and the processing of the loan.  The refinance resulted in $101,826 being

deposited into Duren's and Jennifer Duren's joint account at Mission Federal Credit Union Bank.

89.   Duren's last mortgage payment for his home located at 23722 Monet Way, Sun City, California was on was on January 1, 2009.  A review of Duren's bank accounts show that during this time, Duren maintained payments for his rental properties in Philadelphia, Pennsylvania and had approximately $50,000 in his bank account.  In October 2009, Duren applied for approval to short sale his residence through his authorized agent, Massah Chatton, Strategic Mortgage Consultant, Cambridge Loan Services, 201 Lomas Santa Fe #340, Solana Beach, California.  On October 15, 2009, Duren wrote a statement to the financial institution requesting approval to sell his residence via short sale and stated that he was (Verbatim) "separating from wife, living alone in home and want(s) to let it go.  Can not afford the mortgage alone."  The request was denied and the home went into foreclosure in December 2009.

90.   In Duren's background investigation, he stated (noted with "estimate"), that he lived at 23722 Monet Way, Sun City, California, with his wife, Jennifer Duren from August 2005 to March 2008.  Records show that Tyrone and Jennifer Duren lived at 23722 Monet Way, Sun City, California from August 2005 to March 2009.

91.   A review of records indicated that in early 2009, an "Approval Certificate" letter was drafted on the behalf of Jennifer Duren, showing that she had been approved by Cambridge Home Loans for a purchase of up to $162,126.  The certificate was written by Massah Chatton, Strategic Mortgage Consultant, Cambridge Loan Services, 201 Lomas Santa Fe #340, Solana Beach, California and indicated that Jennifer had "full pre-qualification" for the loan as Jennifer's credit report, income documentation and asset information had already been reviewed by Cambridge Home Loans.  On March 26, 2009, Jennifer Duren, purchased 1819

Overland Court, Hemet, California for $167,000.  On the loan application she listed her status as "a single woman," and stated that she made $3,903.60 a month as an employee of Greenery Properties.  She stated that she had worked at Greenery Properties for five years from 2004-2009.  Greenery Properties consisted of one property owned by Duren's previous business partner Sanders.  In an interview, the business partner denied that Jennifer Duren ever worked for Greenery Properties or received any salary or payments from them.  A review of the Duren's bank accounts failed to show any monthly income for Jennifer Duren.  Tax returns revealed that Jennifer Duren claimed no income during the years that she claimed she made $3,903.60 per month from Greenery Properties.  Jennifer Duren also stated on the loan application that she paid $1,900 a month in rent to live at 1554 Corte Daniel, San Diego, California.  Record checks and Duren's background investigation records show that Duren's parents own and live at 1554 Corte Daniel, San Diego, California.  Duren claimed on his background investigation that he lived at 1554 Corte Daniel from December 2003 to March 2005 when he and Jennifer Duren purchased 23722 Monet Way, Sun City, California.  A search of bank records failed to show any monthly withdrawals of $1,900 or anything similar to support her claim that she paid rent.  On February 2, 2009 Jennifer made an initial deposit of $2500 and on March 16, 2009, Jennifer made second deposit of $56,593.75 to purchase the property located at 1819 Overland Court, Hemet, California.  She withdrew this money from the Tyrone and Jennifer Duren's joint bank account at Mission Federal Credit Union Bank.  This is the same account where the $101,826 from the cash out refinance was deposited.

92.   On December 1, 2009, Duren's foreclosed residence located at 23722 Monet Way, Romoland, California, was sold to the highest bidder at a foreclosure auction for $260,000.  The Trustee's Deed recorded that the amount of the unpaid debt together with costs was $669,554.27.

93. Duren claimed in his background investigation that he sold his residence located at 23722 Monet Way, Romoland, California in a "short-sale." When questioned by the background investigator regarding records that showed the property had been foreclosed, Duren provided a supplemental statement claiming that he provided a copy of his federal taxes showing a $62,000 loss as a result of the short-sale of his primary residence to Flagstar. Copies of Duren's income taxes were seized during the search of his home. Although Duren claimed a loss of $62,000 on his 2009 federal income taxes, Duren stated on his California State Taxes that his home located at 23722 Monet Way, Romoland, California was foreclosed with a loss of over $610,000. (AGENT NOTE: Tyrone and Jennifer Duren filed jointly on their 2009 federal taxes.) Of interest, the Duren's also took a deduction for "Business use of Home" for their residence at 1819 Overland Court, Hemet, CA.

94. On October 15, 2014, Flagstar Bank's Mortgage Fraud Investigation Unit (MFIU) reported an allegation of mortgage fraud in the form of misrepresentation of financial obligations consisting of undisclosed debts related to a home loan secured by Duren. A review was conducted of this conventional cash out refinance transaction of the owner occupied property located at 23722 Monet Way, Sun City, California 92586. The mortgage loan application was originated on July 31, 2007. Duren, identified as the borrower, failed to disclose two properties obtained by him prior to closing the subject transaction on August 27, 2007. The two undisclosed properties are 2317 Dickenson St, Philadelphia, Pennsylvania, purchased on June 4, 2007 and 2037 Wilder Street, Philadelphia, Pennsylvania, which was obtained on July 10, 2007. Neither the cost to purchase these properties, or the taxes and insurance payments associated with them were included in the borrower's debt to income ratio. Flagstar Bank determined that had these additional expenses been added to the borrower's debt to income ratios, it would have brought the level of risk associated with this transaction to an unacceptable level. In summary, Duren as the

borrower failed to provide a factual financial statement on his mortgage loan application. Flagstar Bank stated in their allegation that had they been aware of this misrepresentation the loan would not have been approved.  The borrower defaulted on the subject mortgage and Flagstar Bank realized a loss in excess of $360,000.00, which represents the unpaid principal balance, negative escrows and legal fees.

95.   On October 3, 2013, Duren purchased his current primary residence located at 31241 Old River Road, Bonsall, California for $440,000 through a private lender.  Duren is listed as "a married man" and sole owner of the property.  Duren provided $70,000 to Union Bank as an escrow deposit to purchase the residence. Duren provided the $70,000 to the bank in $100 dollar bill denominations that were wrapped by rubber bands and packed in a backpack.  The property underwent major upgrades and repairs for several months which were mostly paid for in cash.

96.   On September 8, 2014, DHS OIG, ICE OPR, and IRS executed a federal search and seizure warrant at 31241 Old River Road, Bonsall, California. At that time, both Duren and Jennifer Duren resided in the home along with their daughter, Gabriella.

97.   On September 12, 2014, Jennifer Duren sold 1819 Overland Court, Hemet, California for $250,000.

**Travel by Duren**

98.   The investigation into Duren's financial background revealed that although in his interview with investigating agents he claimed to be -a real estate millionaire since the early 2000's, Duren appeared to be struggling financially after filing for bankruptcy in 1999 and foreclosing on his residence in 2009.  Bank records from 2008 revealed that Duren appeared to be living off the $102 thousand dollar cash out refinance of his residence before the foreclosure because of a pay cut from his change of employment from CHP to HSI Special Agent.  Financial records revealed a huge increase of unsubstantiated deposits of cash in Duren's bank

accounts beginning in 2011-2012, around the same time that he started to seize currency shipments associated to drug transportation organizations.  Coincidentally at that same time period, the Duren family also began taking long international vacations.  Flight records indicated Duren has traveled internationally several times in 2012 to present to include trips to Mexico, the Caribbean, Israel, Switzerland, Croatia, Spain, Russia, Greece, Italy, Germany, France and the United Kingdom, along with domestic vacations to Hawaii.

99.    On March 30, 2015, Duren traveled from Philadelphia, Pennsylvania to New York City, New York and boarded Amtrak Train # 69 to Montreal, Canada. Duren was inspected by the Canadian Border Services Agency (CBSA). During the course of the secondary search, Duren declared the purpose of his trip to Canada was to take a flight from the Montreal Airport back to California.  Duren stated he works in Real Estate in Philadelphia, Pennsylvania but resides in California and that the flight back to the West Coast, USA was cheaper via Montreal than via the USA.  Duren had a hotel reservation at HI-Hotel in Montreal for that evening, March 30, 2015.  Database checks for Duren were negative for any flights from Montreal, Canada to California.

100.   It was later determined that contrary to what Duren said to CBSA Officers when he first entered Canada on March 30, 2014, Duren flew from Montreal, Canada on March 31, 2015, to Zurich, Switzerland and on to Rome, Italy.

101.   On April 14, 2015, Duren flew into the Montreal International Airport from Zurich, Switzerland and Rome, Italy on Flight LX 86.  Duren was inspected by CBSA Officers at the Pierre Elliott Trudeau Airport in Montreal, Canada. Duren stated his personal residence is located at 4225 Oceanside Blvd #512, Oceanside, California, 92056 and did not provide any details regarding his trip to Europe.

102.   On July 26, 2016, Duren, his wife, Jennifer Duren, and daughter, Gabriella Duren flew from Chicago to London.  During an outbound inspection

conducted by Customs and Border Protection (CBP), Duren declared that he was traveling to London, United Kingdom for a 30 day vacation.

103.   Record checks revealed that on July 26, 2016, Duren and his family took a flight from London-Gatwick to Tel Aviv, Israel.

104.   On August 25, 2016, Duren, his wife, Jennifer Duren, and daughter, Gabriella Duren returned home on a flight from Madrid, Spain to Miami.  During an inbound inspection conducted by CBP, Duren declared that he traveled to Europe with his wife and daughter for 30 days on vacation, and that he always goes on vacation every year for a month with his family.  Duren stated that on this trip they visited several countries to include Israel, Switzerland, Croatia, Spain, Russia and the United Kingdom. He added that they traveled by train, plane and even took a cruise. Duren was also in possession of a carry-on handbag with some documents.

**Foreign Bank Accounts**

105.   The following are some of the documents that Duren had in his possession and were discovered during the DHS CBP international border inspection: documents revealing that Duren opened two bank account at Privredna Banka Zagreb in Split, Croatia in April 2015.  There was also a stamp in Duren's passport for Split, Croatia dated April 7, 2015.

106.   Numerous documents revealing that Tyrone Duren was issued a credit card that was associated to one of his known bank accounts at Privredna Banka Zagreb in Zagreb, Croatia while on their latest European vacation on August 22, 2016.  Documents also revealed that Jennifer Duren was added as a Power of Attorney over both of the Privredna Banka Zagreb bank accounts that are under the name of Tyrone Duren.  Documents showed that Jennifer Duren and Gabriella Valaria-Simone Duren, Tyrone and Jennifer's daughter, were each issued "Deposit Slip Personal Identification Numbers" at Privredna Banka Zagreb Bank in Zagreb, Croatia.

107.   Open source research by agents via the internet (https://zauvijek.crobiznet.com/) on November 23, 2016, showed that Tyrone Cedric Duren was listed as the only board member for "Zauvijek d.o.o." which is identified as a limited liability company (LLC) that is associated with purchasing and selling real estate and was founded in 2015.  The website indicates the LLC has 2.7 k euros in capital stock and listed the business address for the LLC as Put Muline 33, HR-21220 Trogir, Croatia.

### Possible Transactional Money Laundering Activities

108.   On November 21, 2015, agents interviewed Nathan Bekker, civilian and U.S. citizen.  Bekker stated that he had known Duren for many years because their daughters had become good friends.  Bekker stated that in 2012, he asked Duren if he would loan him money to help him and his wife start up a second location for their business, Grooming Tails Pet Salon, Murrieta, California.  Bekker stated that Duren offered to loan Bekker fifty thousand dollars in cash and that he could pay Duren back with interest.  Bekker stated he was not comfortable with doing the loan that way and suggested that they complete an official loan through Chicago Title Company.  Bekker recalled that in early 2012, he received a fifty thousand dollar check through escrow from the Chicago Title Company.  Bekker stated that in order to repay the loan, he made a nine hundred dollar payment each month to GHP, Oceanside, California.  Bekker stated that he recalled that the loan term was for five years at an unknown interest rate.

109.   A search warrant was served at Duren's residence on September 8, 2014 and evidence collected showed that Duren had been receiving mortgage statements in someone else's name to his residence address.  A review of the evidence showed that Duren had paid the monthly mortgage statements for the mortgage loans associated to Philadelphia, Pennsylvania properties that were not in his name or business name since 2013.  Three mortgage loans were identified as being paid by Duren in which

he was not the borrower or guarantor for the property. Copies of grant deeds indicating that Philadelphia, Pennsylvania properties had been sold to GHP for $1 in 2011 were also found during the service of the aforementioned search warrant however GHP has never been listed as the owner in title and/or property tax records. The properties associated to the grant deeds appear to also be listed as rental properties that are managed by GHP. It is unclear if GHP is the actual owner of the properties as indicated on the grant deeds and if so, it is also unknown how ownership was obtained or agreed upon by the original property owner and GHP.

**Tax Evasion**

110.   Bank deposits on Duren's accounts are inconsistent with what he reports on his business or personal income tax returns. Duren's 2008 and 2009 tax returns do not appear to be correct as to every material matter and Duren has not filed his business or personal income tax returns for the years 2010 through 2015.

111.   On July 21, 2015, Jennifer Duren filed her 2014 federal income tax return. Jennifer filed as a single person and did not claim any dependents. Jennifer claimed that her only income came from her employer "Southwest Payroll Services, LLC, 27442 Portola Pkwy, Foothill Ranch, CA 92610" where she earned $34,533. Jennifer listed her address as 1554 Corte Daniel, Oceanside, California 92056. Prior to 2014, her previous tax return filed was for the year 2009 where she filed as married and filed jointly with Tyrone Duren.

112.   A review of Philadelphia, Pennsylvania property tax records show that the majority of the 30 properties owned by GHP, U.S. Holding, LLC and/or Tyrone or Jennifer Duren are 1 to 5 years delinquent in property tax payments. The only five properties owned by GHP, U.S. Holding and/or Tyrone or Jennifer Duren that are not delinquent on property tax payments are the properties in which the loan required that property taxes be collected with the monthly mortgage payment and paid through escrow. As of August 2016, it is estimated that Tyrone and/or Jennifer

Duren, owe approximately $56,000 in property taxes for GHP and U.S Holding rental properties in Philadelphia, Pennsylvania.

## IV

## PROBABLE CAUSE TO SEARCH PROPERTIES

113.   Based on the information provided in this affidavit, there is probable cause to believe that evidence of Duren's offenses will be located in his personal residence located at 31241 Old River Road, Bonsall, California.  This is the location where all GHP financial transactions are recorded and where documents relating to the same are stored.  Furthermore, there is probable cause to believe that evidence of Duren's offenses will also be located within his home and vehicles.  Duren's residence has been the principal office for GHP ever since the business was formed (late 2006).

114.   In Duren's 2007 filed federal tax returns a deduction for "Business use of Home" was taken.

115.   In January 2011, Duren filed his 2008 and 2009 personal tax returns and took a deduction for "Business use of Home".

116.   On October 09, 2013, Duren made a $70,000 cash deposit for the purchase of the residence located at 31241 Old River Road, Bonsall, CA.

117.   Based on my experience, training, and conversations with other special agents, I know that individuals frequently maintain records of financial accounts and transactions in their personal residences and electronic devices. These records are commonly kept for numerous years, in both paper and electronic forms, and contain information which is otherwise unattainable through less intrusive means.

## V

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

118.   With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding

computers and other electronic storage devices, including electronic storage med that may contain data subject to seizure pursuant to this warrant:

**Forensic Imaging**

a.      After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five (45) days of seizure absent further application to this court.

**Identification and Extraction of Relevant Data**

b.      After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are literally thousands of different hardware items and software programs, and different versions of the same program that can be commercially purchased, installed and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

c.      Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created or downloaded or copied, when was it last accessed, when was it last modified, when was it last printed and when it was deleted.

Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

d.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.

The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

   e. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

   f. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**Prior Attempts to Obtain Data**

   g. The United States has attempted to obtain this data by other means. The prior attempts were successful however new investigative leads have been developed and we have probable cause to believe that evidence of Duren's offenses will be located within his cellular phones, laptop computer, and camera.

# VI

## CONCLUSION

119.   Based on the facts above, my training and experience, and a review of the documents and other relevant information that I believe is reliable, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law will be contained within the items fully described in **Attachments A1-A4**.


Dated this _6 th_ day of December, 2016.


Thomas E. Miller
Special Agent
U.S. Immigration and Customs Enforcement
Office of Professional Responsibility

Subscribed and sworn to before me
This _6 th_ day of December, 2016 at San Diego, California.


HONORABLE KAREN S. CRAWFORD
United States Magistrate Judge
Southern District of California